**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

AROR ARK O'DIAH,

                              Plaintiff,

    v.                                No. 08-CV-941
                                          (TJM/DRH)

THE STATE OF NEW YORK; BRIAN FISCHER;
MICHAEL CORCORAN; MALCOLM R. CULLY;
RONALD W. MOSCICKI; STEPHEN GUTER; C.O.
RAMSAY; D. RICHARDSON; J. PEPIN; J. HAHN;
MR. & LT. SHAW; HEREFORD INSURANCE
COMPANY; JERRY MAKULIK; and SCOTT C.
CARLSEN;

                              Defendants.

---

**APPEARANCES:**                          **OF COUNSEL:**

AROR ARK O'DIAH
Plaintiff Pro Se
07-A-2463
Wyoming Correctional Facility
Post Office Box 501
Attica, New York 14011

HON. ANDREW M. CUOMO          ROGER W. KINSEY, ESQ.
Attorney General for the              Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

PETRONE & PETRONE, P.C.           DAVID H. WALSH, IV, ESQ.
Attorneys for Defendants Hereford
   Insurance Company & Jerry
   Makulik
1624 Genesee Street
Utica, New York 13502

**DAVID R. HOMER
U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Aror Ark O'Diah ("O'Diah"), an inmate currently in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, eleven DOCS employees ("State Defendants"), the State of New York, a private individual ("Makulik"), and his insurance company (together "Individual defendants"), violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, the New York State Constitution, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.. Compl. (Docket No. 1). Presently pending is State defendants' motion to dismiss or for a more definite statement pursuant to Fed. R. Civ. P. 8 and 10. Docket No. 28. O'Diah opposes dismissal but "will not object to file first amended complaint should the Court . . . order . . . [it] . . . .". Docket No. 30 ¶12. Additionally, the individual defendants' move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 42, 45. O'Diah opposes the motion and files a cross-motion for dismissal. Docket No. 44. For the following reasons, it is recommended that State defendants' motions be granted, individual defendants' motion be denied without prejudice to renewal after transfer to the Eastern District of New York, O'Diah's cross motion is denied, and O'Diah be ordered to file an amended complaint.

**I. Background**

The facts are related herein in the light most favorable to O'Diah as the non-moving party. See subsection II(A) infra. O'Diah's allegations concern numerous incidents

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

involving numerous defendants and are presented herein as they relate to his various claims.

### A. First Amendment

O'Diah contends he was the victim of multiple retaliatory grievances which were filed to block or hinder his ability to file state court appeals, his incoming and outgoing legal mail was tampered with, he was prevented from being able to communicate with his appellate counsel, and he was denied the right to practice his religion. Compl. ¶¶ 3,4, 45, 67, 80.

Specifically, O'Diah was granted an order to show cause ("OTSC") by state county court on or about June 3, 2008. Compl. ¶ 6. On the day the OTSC was issued, or shortly thereafter, O'Diah was subjected to a retaliatory misbehavior report and disciplinary hearing which resulted in ninety days of keeplock confinement.[2] Id. ¶¶ 6, 34. Additionally, on July 24, 2008, the day the OTSC was scheduled to be returned, O'Diah was in keeplock and had been denied access to communicate with his appellate attorney, procure his legal mail, and collect his legal personal property. Id. ¶¶ 31, 53. O'Diah also presents at least four other instances of retaliatory events when (1) he was charged with refusing to consent to the provision of ibuprofen for his urinary tract infection (Id. ¶ 37); (2) he was denied his scheduled doctor's appointment on March 4, 2008 and access to communicate with his appellate attorneys and view his legal work and personal property by defendant Mawhir after having filed a grievance against defendant Corcoran on February 27, 2008 (Id. ¶ 39);

---

[2]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6 (2007).

(3) defendants Corcoran, Carlsen, Cully and Fischer colluded to transfer him on May 9, 2008 to the shock incarceration program at Livingston Correctional Facility where his legal papers were lost and ability to speak with his legal representative (Id. ¶¶ 32, 59-61); and (4) when he was sentenced to sixty days in keeplock after filing an ADA request for reasonable work accommodations (Id. ¶ 69).

O'Diah also claims that his right of access to the courts were interfered with on at least two occasions. The first instance occurred on January 26, 2007, when O'Diah was prevented from appearing in Queen's County Court in his underlying criminal case. Compl. ¶ 79. The second instance occurred on June 11, 2008, when defendant Moscicki seized all of his outgoing mail and his mail was otherwise damage by defendants Hahn, Shaw, and Moscicki. Compl. ¶¶ 63, 74.

In addition, O'Diah attached at least one grievance concerning his First Amendment rights from April 21, 2008 when he complained that he was not be provided with his legal mail sent from his family. Docket No. 1-2 at 60. Additionally, O'Diah included two Superintendent Responses to grievances filed on April 18, 2008 and May 20, 2008 concerning whether his legal mail had been tampered with. Docket No. 1-2 at 61-62.

### B. Fourth Amendment

O'Diah contends that while he was in keeplock, at or about the time his OTSC was granted, his cell was searched while he was simultaneously being denied his First Amendment rights. Compl. ¶ 31.

4

### C. Fifth Amendment

O'Diah was limited to confront witnesses during disciplinary hearings over the telephone. Compl. ¶ 8.

### D. Eighth Amendment & ADA

O'Diah contends that, as a whole, inmates receive substandard medical care as compared to the outside world. Compl. ¶ 50. Specifically, O'Diah alleges deliberate indifference to two major serious medical needs. In the first, O'Diah alleges that

> [he] was unable to perform[] hazardous work assignments that repeatedly aggravated [his] pre-existing medical condition of head trauma, causing [him] irregular and elevated blood pressure and dizziness. [O'Diah] requested for reasonable work assignment accommodation with Disability Act . . ., instead, [he] was subjected to a total of eleven[] months and eleven days irrational solitary segregated . . . confinements within the last 12 months through October 17, 2008.

Id. ¶ 76. O'Diah's prior medical condition, resulting from head trauma, left him prone to dizziness, headaches, and memory loss. Id. ¶ 2. With said medical problems, defendants were deliberately indifferent when they transferred him to a different facility and job placement, from approximately May 9, 2008 until June 3, 2008, where he was subjected to excessive cigarette smoke which exacerbated his medical conditions. Id. ¶¶ 3, 4, 12-14, 18, 33, 72. The work environment also caused him anxiety, because O'Diah was told if he did not report to work he would be sent to keeplock, and irregular, elevated blood pressure. Id. ¶¶ 15-17.

When O'Diah visited a facility physician on June 2, 2008, he was informed that the physician was forbidden from issuing him a different work order. Id. ¶ 19. Additionally, on

5

June 3, 2008, when O'Diah wrote to the grievance supervisor requesting a new job, the request was purposefully ignored, and he was further required to clean the cigarette waste which aggravated his medical conditions. Id. ¶¶ 20-22. Also on June 3, 2008, O'Diah was subjected to (1) cruel and inhumane punishment when he was locked in a room in the infirmary for four hours and verbally taunted and laughed at by the utility sergeant when he was later stripped down prior to entering SHU, and (2) excessive force when he was roughly cuffed and escorted to keeplock. Id. ¶¶ 22-26. Specifically named in these events are defendants Fischer, Carlsen, and Cully. Id. ¶¶ 33, 72. In relation to these medical problems, O'Diah concedes he has been sent for MRIs, EKGs, and x-rays, but that none of these exams brought him any relief as he is still suffering immense pain and requires the help of a specialist. Id. ¶¶ 48, 165.[3]

Additionally, on September 13, 2007 when O'Diah was transferred to Ulster Correctional Facility, he began feeling a burning, stinging feeling in his urinary tract. Compl. ¶¶ 37, 65. O'Diah used multiple different pain relievers, to no avail. Id. O'Diah was seen by a non-party medical staff member who prescribed him ibuprofen. Id. O'Diah refused the pain relievers and suggested blood and urine analyses be performed. Id. The medical staff member refused, charged O'Diah with that he became violent with the medical staff, and O'Diah was sentenced to another thirty days in keeplock (from September 13, 2007 until October 19, 2007), leaving his urological issues to go without treatment from July 29 until October 24, 2007. Id.

O'Diah was also forced to take medication which he refused. Compl. ¶ 41. On March

---

[3] O'Diah also makes a specific complaint that he was denied outside medical consultations for his head trauma and urological complications. Compl. ¶ 39.

19, 2008, a non-party medical personnel member came to O'Diah's keeplock cell and ordered him to take medication without providing him with the medication information. Id. ¶¶ 41, 64. When O'Diah refused, the medical personnel member and a non-party corrections officer forced him to take the medication against his will. Id.

Lastly, after being released from keeplock for allegedly failing to comply with his special law library access, O'Diah was subjected to cruel and unusual punishment from the other inmates. Compl. ¶ 38. The inmates assaulted O'Diah and poured cold water on his person and his property. Id. O'Diah's complaints were ignored. Id.

O'Diah's additional submissions attached to the complaint include multiple grievances pertaining to his Eighth Amendment violations including (1) requests to be excused from his employment (Docket No. 1-2 at 41); (2) the denial of medical treatment and refusal to acknowledge his complaints (Docket No. 1-2 at 42, 51); and (3) his exposure to a cruel and unusual work environment (Docket No. 1-2 at 43).

### E. Fourteenth Amendment

O'Diah contends that he was subjected to multiple false misbehavior reports that led to convictions. Specifically, he contends that he has been placed in keeplock without just cause on August 8, September 13, and November 2007, and March 7 and June 3, 2008. Compl. ¶ 35. On August 8, 2007, O'Diah was charged with refusing to attend an academic and vocational call-out program for which he had already been exempted on June 6, 1007. Id. ¶¶ 36, 55. O'Diah received ten days in keeplock. Id. In September 2007, O'Diah was charged with refusing to take additional pain medication for his urinary tract infection and spent an additional thirty-six days in confinement. Id. ¶¶ 37, 56. O'Diah was also charged

7

and sentenced to thirty days in confinement by Mawhir, Corcoran and Ramsay, for failing to comply with his special law library access even though he had notified multiple individuals, multiple times, that he had satisfied his state court appeal necessitating the special access and the permission was no longer needed. Id. ¶¶ 38, 57.

On March 5, 2008, O'Diah was charged with refusing to go to work, despite the fact that he was actually ill, had just given blood, and shortly before had grieved for appeal materials relating to his state court cases. Id. ¶¶ 39, 58, 69, 70. On March 10, 2008, O'Diah was charged and sentenced to sixty days in keeplock for allegedly harassing the acting superintendent after filing an inquiry into why two money orders, sent to O'Diah by his family for the purpose of paying court filing fees, were not provided to him. Id. ¶¶ 40, 47, 71. O'Diah was charged on June 3, 2008, after authoring a grievance seeking reasonable work accommodations, for failure to follow work orders and continue cleaning the cigarette waste. Id. ¶ 28. O'Diah was sentenced to ninety days confinement and this was a factor in his retaliatory transfer, which occurred without due process. Id. ¶¶ 60, 73. Lastly, O'Diah was charged on June 5, 2008, with creating a disturbance, for which he was sentenced to sixty days confinement and a retaliatory transfer. Id. ¶¶ 41, 64, 71.

With respect to one disciplinary infraction, presumably the harassment ticket, from March 10, 2008, O'Diah's appeal was granted and the hearing disposition was reversed, vacated, and ordered expunged from the records as of May 2, 2008. Compl. ¶¶ 9, 51, 59, 71; Docket 1-2 at 36). However, O'Diah was not released and was instead transferred to keeplock seven days later. Compl. ¶¶ 9, 71.

Other Fourteenth Amendment violations include (1) an equal protection claim that O'Diah was not housed in a medically appropriate facility due to his race (Compl. ¶ 3); (2)

8

procedural due process claims that O'Diah was not given proper notice for his keeplock confinement on June 3, 2008 and that he named nine witness to be called at one of his hearings and none of the nine were called (Id. ¶¶ 8, 27); and (3) property claims that O'Diah's account was improperly debited for the purchase of stamps and copier services, which O'Diah never received (Id. ¶ 74; Docket No. 1-2 at 64, 66).

### F. Other State Claims

O'Diah also asserts that defendants violated their own state policies and procedures on multiple occasions. Compl. ¶¶ 4, 36, 39. Lastly, O'Diah contends that he has been unconstitutionally incarcerated based upon false witnesses and testimony, false representations, an unlawful arraignment, and malicious prosecution. Id. ¶ 1.

### G. Claims Against Individual Defendants

On November 9, 2005, O'Diah was involved in an automobile accident with Makulik, who was insured by Hereford Insurance Company. Compl. ¶ 81; Docket No. 44, Statement of Fact in Support of Claims ("Facts") ¶ 4. The impact exacerbated O'Diah's previous head trauma injuries. Compl. ¶ 81 The insurance company agreed to pay for damages. Id.; Docket No. 44, Preliminary Statements ¶ 2.

From June 8, 2006 until present, O'Diah alleges that Hereford Insurance Company participated in a conspiracy with the Port Authority of New York and New Jersey, New York City, and New York State in a racially motivated campaign to subject O'Diah to an unlawful arrest on June 22, 2006 based on having a revoked driver's license. Compl. ¶ 82; Docket

No. 44, Preliminary Statements ¶ 3.[4]  As a result, O'Diah has been denied various constitutional rights including those related to movement, life, and liberty.  Compl. ¶ 83.  Additionally, O'Diah contends that individual defendants' actions, in conjunction with the Queens County District Attorney, encouraged O'Diah's counsel to be ineffective during his underlying state criminal proceedings.  Docket No. 44, Facts ¶ 21.

### H. Procedural History

Prior to the filing of this action, O'Diah filed another complaint against similar, or identical, defendants regarding similar claims.  See O'Diah v. Mawhir et al., No. 08-CV-322 (TJM/DRH) (hereinafter O'Diah I).  In that case, in an order dated April 18, 2008, all claims against the City of New York and the Port Authority were severed and transferred to the Eastern District of New York.  O'Diah I, No. 08-CV-322 (TJM/DRH), Docket No. 2.  Defendants in O'Diah I then filed a motion to dismiss pursuant to Fed. R. Civ. P. 8 and while that was pending, O'Diah filed the present complaint.  Pursuant to an order dated November 24, 2008, defendants in O'Diah I were granted their motion to dismiss and O'Diah given until January 8, 2009 to file an amended complaint in compliance with Fed. R. Civ. P. 8.  Id., Docket No. 31.

### II.  Discussion

In his complaint, O'Diah alleges that defendants violated his (1) First Amendment rights

---

[4] O'Diah's license had apparently been restored on May 5, 2006 and revoked on March 17, 2007 pursuant to the influence of defendants in order to keep O'Diah incarcerated and precluded from pursuing his civil action.  Docket No. 44, Facts ¶¶ 7-11, 17, 20.

10

by retaliating against him, impeding his access to the courts by confiscating and failing to protect his legal mail, and preventing him from participating in religious services; (2) Fourth Amendment rights by continually searching his cell, presumably for improper, retaliatory purposes, (3) Fifth Amendment rights by failing to be provided with the opportunity to face his accusers at disciplinary proceedings, (4) Eighth Amendment rights by subjecting him to excessive force, failing to protect him, and being deliberately indifferent to his medical treatment by forcing him to work in conditions which exacerbated his health conditions and failing properly to treat his urological ailments, and (5) Fourteenth Amendment rights by failing adequately to protect his property, sentencing him to disciplinary confinement pursuant to false misbehavior reports, violating his equal protection rights, and failing to provide him with adequate due process. State defendants argue that the complaint should be dismissed because O'Diah did not comply with the pleading requirements and New York and its employees, in their official capacities, are immune from suit. Individual defendants argue that the complaint should be dismissed because they are not state actors and there is no merit to O'Diah's allegations of a conspiracy.

### A. Legal Standard

Fed. R. Civ. P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994). Dismissal is only warranted if it appears beyond a reasonable doubt that the non-moving party can prove no

set of facts in support of his or her claim which would be entitled to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

### B. Sufficiency of Pleading

Fed. R. Civ. P. 8(a) requires that a pleading "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . , (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." "The purpose of the Rule is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a *responsive answer*, prepare an adequate defense, and determine whether the doctrine of res judicata is applicable." Powell v. Marine Midland Bank, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (citing Brown v. Califano, 75 F.R.D. 497, 498 (D.C.D.C. 1977)).

Rule 10 of the Federal Rules of Civil Procedure states, in relevant part, that:
All averments of claim or defense shall be made in numbered paragraphs, the

12

> contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings.  Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth.

Fed. R. Civ. P. 10(b).  Rule 10 "was designed 'to facilitate[ ] the clear presentation of the matters set forth,' so that allegations might easily be referenced in subsequent pleadings.'" Phillips v. Girdich, 408 F.3d 124, 128 (2d Cir. 2005) (quoting Fed. R. Civ. P. 10(b)).

A complaint that fails to comply with these Rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).  The Second Circuit has directed that, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative . . . to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1998)).  "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  Id.

O'Diah has once before been instructed to comply with the pleading requirements of the federal rules.  However, that instruction came after the initial filing of the present complaint, thus the admonition is improper to consider in the present motion.  It is undeniable that O'Diah's present complaint of fifty-four single-spaced pages, together with thirty-five pages of exhibits, pushes the bounds of a short and plain statement.  The Complaint also includes multiple repetitive clauses, connected by long, confusing sentences which are, at best, difficult to decipher.  Indeed, it is difficult to fully comprehend the nature and details of the present claim.

O'Diah has multiple pages worth of potentially meritorious, albeit conclusory, allegations which cannot be said to be wholly frivolous. Additionally, given that this was O'Diah's first pleading, it was written and filed seven months prior to the order in O'Diah I, and O'Diah has expressed an ability and willingness to amend the present complaint. Therefore, the Court will strike the complaint and grant O'Diah until November 1, 2009 to file an amended complaint that fully complies with Rules 8 and 10. As previously recommended in O'Diah I,

> In repleading, Plaintiff is strongly encouraged (but not required) to organize his Amended Complaint as follows:
>
> > (1) the Amended Complaint should contain separately numbered paragraphs that specify:
> > (i) the alleged act or acts of misconduct,
> > (ii) the name of each individual Defendant who participated in the misconduct, and;
> > (iii) the connection between the alleged misconduct and Plaintiff's constitutional rights or other claimed rights under the ADA;
> > (2) the Amended Complaint should contain facts which, if proven, would establish that each of the named Defendants were personally involved in the alleged constitutional or statutory violations; and
> > (3) the Amended Complaint should contain facts that indicate how Plaintiff was harmed or injured by the alleged misconduct
>
> Plaintiff also should omit irrelevant matters and matters that are the subject of other ongoing litigation, and avoid repeating facts, claims, or allegations.

O'Diah I, No. 08-CV-322 (TJM/DRH), Docket No. 31 at 3-4.

Accordingly, defendants motion on this ground should be granted.

### C. Eleventh Amendment

O'Diah sues the state defendants in both their individual and official capacities. Docket No. 30 ¶ 5. He also sues the State of New York. Id.

14

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

Therefore, O'Diah's claims against the State of New York are expressly barred by the Eleventh Amendment.  Additionally, a suit against a state official in his or her official capacity is a suit against the entity that employs the official.  Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Here, O'Diah seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCS.  Thus, the Eleventh Amendment bar applies and serves to prohibit O'Diah's claim for monetary damages against the individual defendants in their official capacities.

Accordingly, it is recommended that defendants' motion be granted on this ground as well.

### D. Individual Defendants

Individual defendants claim that they are not state actors and therefore, Section 1983 is inapplicable to them. Without deciding their motion, in accordance with O'Diah I, the undersigned has determined that the more appropriate course of action is severance and transfer of the claims to the Eastern District.

In the event of misjoinder of parties, "[a]ny claim against a party may be severed [by the Court] and proceed separately." Fed. R. Civ. P. 21. In deciding whether the application of Rule 21 is appropriate, the Court should consider the following:

> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

Morris v. Northrop Grumman Corp., 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999). Additionally,

> A claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer. Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants.

Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986) (citations omitted).

In this case, the claims against individual defendants, along with those against the City

of New York, Port Authority of New York and New Jersey, and Queens County District Attorney are all arising out of the Eastern District of New York.[5] These occurrences are separate and distinct from the constitutional violations alleged in conjunction with the State defendants and O'Diah's incarceration. The claims will require different witnesses, different documentary proof, and involve different questions of law and fact. Similar to the reasoning in O'Diah I, the present claims against individual defendants, the City of New York, the Port Authority of New York and New Jersey, and the Queens County District Attorney are all severed and should be transferred to the Eastern District.

Motions to transfer venue are subject to "a two-part test: (1) whether the action to be transferred might have been brought in the transferee venue; and (2) whether the balance of convenience and justice favors transfer." Rescuecom Corp. v. Chumley, 522 F. Supp. 2d 429, 448 (N.D.N.Y. 2007). Unless otherwise provided, the venue for a civil action is properly in "a judicial district where any defendant resides, if all defendants reside in the same state" or in "a judicial district in which a substantial part of the events . . . giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b). Suits, as here, seeking recovery under 42 U.S.C. § 1983 are governed by these provisions. See Bunn v. Gleason, 462 F. Supp. 2d 317, 319 (D. Conn. 2006) (applying § 1391(b) to a § 1983 action).

In this case, the car accident which is the precipitating factor for all other alleged conspiracies and events, occurred in the Eastern District of New York. The underlying prosecution regarding the car accident and forfeiture of O'Diah's license also occurred in

---

[5] While O'Diah does not name the Port Authority or Queens County District Attorney as defendants in this case, they are continually referenced in his opposition to individual defendants' motion to dismiss and his cross-motion. Docket No. 44.

the Eastern District. Additionally, "[i]n a suit against a public agency and its officials, "residence," for venue purposes, is where the officials involved perform their duties." Cain, 630 F. Supp. at 225 (citations omitted). Thus, with regard to the alleged actions of the City of New York and their collusion with the Port Authority and Queens District Attorney, the Eastern District of New York is the appropriate venue. Additionally, the balance of fairness and judicial economy compel transfer to the Eastern District. The majority of witnesses and underlying documentation lay in the Eastern District. Additionally, all similar claims which arose out of O'Diah I have already been transferred to the Eastern District where litigation has continued. O'Diah I, No. 08-CV-322 (TJM/DRH), Docket No. 2.

Accordingly, individual defendants' motion to dismiss should be dismissed without prejudice to renewal upon transfer to the Eastern District of New York.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. State defendants' motion to dismiss (Docket No. 28) be **GRANTED** and O'Diah's complaint (Docket No. 1) be **DISMISSED WITHOUT PREJUDICE** as to all state defendants in their individual capacities and he be given thirty days after a final decision on these motions is received from the district court; and

2. The complaint be **DISMISSED WITH PREJUDICE** as to the State of New York and State defendants in their official capacities.

3. All claims pertaining to individual defendants be **SEVERED** and **TRANSFERRED** to Eastern District of New York;

18

4. The motion of individual defendants to dismiss the claims against them (Docket No. 42) be **DENIED** without prejudice to renewal after the claims against them are transferred to the Eastern District of New York; and

5. O'Diah's motion (Docket No. 44) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 20, 2010
       Albany, New York

David R. Homer
United States Magistrate Judge